UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KEDS, LLC and SR HOLDINGS, LLC, | ) )  ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No.: |
| HANESBRANDS INC., | ) ) ) |
| Defendant. | ) ) |

**COMPLAINT AND JURY DEMAND**

This is an action for breach of contract, breach of the implied covenant of good faith and fair dealing, and violations of Massachusetts General Laws ch. 93A brought by Plaintiffs Keds, LLC and SR Holdings, LLC (collectively, "Keds") against Defendant Hanesbrands Inc. ("Hanes"). Keds' claims arise from Hanes' bad faith scheme to deliberately breach the unambiguous terms of the parties' license agreement in order to pressure Keds to renegotiate the agreement and, thereby, extract valuable financial and other concessions from Keds. By way of this action, Keds seeks to recover the substantial damage caused by Hanes' intentional and unlawful conduct.

**INTRODUCTION**

1. Since 1888, Keds has used the CHAMPION trademark in connection with the sale of footwear in the United States and around the world. Keds owns a United States trademark registration for CHAMPION for footwear, as well as registrations for KEDS CHAMPION in numerous foreign countries.

2. In or around 1987, Hanes sought to expand its CHAMPION-branded apparel business into footwear. Because Keds owns the CHAMPION mark for footwear, Hanes approached Keds about obtaining a license and, on February 4, 1987, Keds and Hanes entered into a license agreement (the "License Agreement"). For the next 34 years, Keds granted Hanes a license to use Keds'

CHAMPION trademark for footwear. The License Agreement helped Hanes build its "Champion" brand and enabled Hanes to generate tens of millions of dollars in profit for Hanes and Hanes' investors.

3. Yet the ink had barely dried on the License Agreement when Hanes began to regret the deal it had signed. Over the years, Hanes repeatedly complained to Keds about the royalty rates it had agreed to pay to Keds, the approval rights the parties had negotiated at arms-length, and the scope of the license Keds had granted to Hanes.

4. In mid-2020, in parallel with an aggressive, multi-billion-dollar corporate growth plan, Hanes decided to take matters into its own hands. Hanes concocted a scheme to leverage and coerce Keds into renegotiating the License Agreement by knowingly and wrongfully filing a meritless federal court lawsuit against Keds. Hanes' lawsuit was a deliberate breach of the express terms of the License Agreement. Moreover, the lawsuit was filed in a transparent attempt to extort Keds by obtaining more favorable contract terms. Hanes' scheme is a quintessential unfair and deceptive practice under Chapter 93A. Its conduct fits squarely within the Massachusetts Supreme Judicial Court's admonition in its seminal *Anthony's Pier Four* case that knowing and intentional breaches of contractual obligations that serve as a negotiating wedge to leverage unwarranted concessions violate Chapter 93A.

5. Hanes' lack of good faith and fair dealing and intentional breaches of the License Agreement warrant not only the damages attributable to those breaches but the full measure of treble damages under Chapter 93A. Hanes' lawsuit—coupled with Hanes' simultaneous media campaign designed to disparage Keds and put further pressure on Keds to renegotiate—irreparably damaged Keds' goodwill and reputation, and forced Keds to incur hundreds of thousands of dollars in legal fees and costs. Those fees and costs will continue to accrue, with interest, as Hanes pursues its baseless appeal of this Court's comprehensive Memorandum and Order dismissing Hanes' complaint

in its entirety.

6.     Further, Hanes' purposeful breach of the License Agreement in violation of its unambiguous terms and ongoing, dogged pursuit of its frivolous, bad faith claims have resulted in a complete breakdown of trust. As a result, Keds simply cannot continue a business partnership with Hanes. Hanes' improper attempt to use the federal courts as a tool to renegotiate the License Agreement has left Keds with no choice but to terminate the License Agreement, robbing Keds of the benefit of its bargain to the tune of millions of dollars in royalties owed to Keds, and ruining what was once a golden opportunity for Hanes to license Keds' highly valued CHAMPION trademark.

## PARTIES

7.     Plaintiff Keds, LLC is a Massachusetts limited liability company with a principal place of business at 500 Totten Pond Road, Waltham, Massachusetts, 02451.

8.     Plaintiff SR Holdings, LLC is a Delaware limited liability company with a principal place of business at 500 Totten Pond Road, Waltham, Massachusetts, 02451.

9.     Upon information and belief, Defendant Hanesbrands Inc. is a Maryland corporation with a principal place of business located at 1000 East Hanes Road, Winston Salem, North Carolina, 27105. In 1989, the Sara Lee Corporation ("Sara Lee") acquired Champion Products, Inc., a signatory to the License Agreement. In 2006, Sara Lee restructured its holdings. As part of the 2006 restructuring, Sara Lee spun off certain lines of business—including the business selling CHAMPION-branded shoes—into Hanesbrands Inc. Accordingly, since 2006, Hanesbrands Inc. has been a signatory to the License Agreement.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 because Plaintiff Keds, LLC is a Massachusetts company with a principal place of business in Massachusetts, Plaintiff SR Holdings, LLC is a Delaware company with a principal place of business

in Massachusetts, and, upon information and belief, Defendant Hanesbrands Inc. is a Maryland company with a principal place of business in North Carolina. Therefore, complete diversity of citizenship exists. The amount in controversy, exclusive of interest and costs, exceeds $75,000.

11. This Court has personal jurisdiction over Hanes because, upon information and belief, Hanes has chosen to do business, and regularly solicits and does business, in Massachusetts with Massachusetts residents in this judicial district, and Hanes derives significant revenue or income from goods sold or services rendered in this judicial district. In addition, Hanes sued Keds in this judicial district in the related case *Hanesbrands Inc., et al. v. Keds, LLC, et al.*, Civil Action No. 20-11354-IT. That lawsuit is directly related to Keds' causes of action here.

12. Venue is proper in this Court pursuant to 28 U.S.C. §1391 because a substantial part of the events giving rise to Keds' claims occurred in this judicial district, including that Hanes filed suit against Keds in breach of the License Agreement in this judicial district.

## FACTUAL ALLEGATIONS

**A.     Keds**

13. Founded in 1916, Keds is one of the most iconic footwear companies in America. Keds' canvas-topped, rubber-soled sneakers—named the "Champion"—have been worn by celebrities from Marilyn Monroe and Jackie Kennedy Onassis to Ariana Grande and Taylor Swift. In addition to the Champion, Keds has offered other popular lines of sneakers, including "Pro-Keds," which were worn by NBA stars Kareem Abdul-Jabbar, JoJo White, and "Pistol" Pete Maravich. Recently, Keds has produced collaborative collections with fashion brands Kate Spade New York, Madewell, and Alice + Olivia.

14. Keds owns U.S. Trademark Registration No. 3,724,951 for CHAMPION for footwear, as well as registrations for KEDS CHAMPION for footwear in a dozen foreign jurisdictions, including in Belgium, Brazil, Canada, France, Germany, Italy, Japan, Luxembourg, Mexico, the

Netherlands, Spain, and the United Kingdom.

**B.     Hanes**

15.     Hanes is a clothing company that sells apparel and footwear under several brands, including Hanes, Champion, L'eggs, and Playtex. Hanes owns two CHAMPION trademarks in the United States, both of which are limited to use of the CHAMPION mark for apparel. Hanes' CHAMPION trademarks do not cover footwear.

**C.     The License Agreement**

16.     In or around 1987, Hanes sought to expand its offerings under the Champion brand from apparel to athletic footwear. Because Keds owned the rights to CHAMPION in connection with all footwear in the United States and Canada, Hanes approached Keds about obtaining a license so that it could sell athletic footwear under the Champion brand it had developed for apparel. On February 4, 1987, Keds and Hanes entered into the License Agreement, which has automatically renewed at the end of each five-year renewal term, the most recent of which began on January 1, 2017. The License Agreement will terminate on October 2, 2021 as a result of Hanes' material breach described herein. A copy of the License Agreement is attached hereto as **Exhibit A**.[1]

17.     The License Agreement granted Hanes a perpetual license to use the CHAMPION mark for "high performance athletic shoes" in the United States and Canada, but retained for Keds the right to continue to use the CHAMPION trademark for all other footwear, including "casual street and play time shoes." Because Keds owns the CHAMPION mark for all footwear, the License Agreement was the only means by which Hanes could lawfully use the CHAMPION mark in connection with footwear in the United States and Canada.

---

[1] The License Agreement and each of the amendments to the License Agreement are attached hereto as Exhibit A. Hanes has expressed concern about the public disclosure of financial information (i.e., royalty rates and information concerning the calculation of royalties) contained in the License Agreement and amendments because Hanes views that information as commercially sensitive. While Keds does not concede that the information is confidential, out of an abundance of caution, Keds has redacted financial information from these materials in view of Hanes' concerns about confidentiality. Keds will provide unredacted copies of these materials (or file unredacted copies) at the Court's request.

18. Over time, Hanes grew to regret the terms of the License Agreement. Among other things, Hanes disliked Keds' approval rights over footwear to be sold by Hanes under the CHAMPION brand. Hanes also expressed its displeasure with the scope of its license and the royalty rates it was required to pay to Keds.

19. The License Agreement was amended twelve times between 1987 and 2020. Each of the amendments gave Hanes the right to sublicense CHAMPION to various third parties under the terms set forth in the amendments. *See* Ex. A. The amendments also provided Hanes with certain other benefits during the term of those amendments. Those benefits included, among other things, an expansion of permitted trade channels for the distribution of licensed products, a shortened approval period, an expansion of the scope of products covered by the license, and modified audit rights.

20. Any rights that Keds granted to Hanes pursuant to an amendment terminated automatically upon the expiration of the term of the amendment. So, for example, Hanes' authorization to sublicense the right to sell "non-athletic, casual" footwear under the CHAMPION mark pursuant to the Tenth Amendment would expire on December 31, 2022, when the term of the Tenth Amendment's term ended. At that point, the scope of the license in the original License Agreement would control—i.e., Hanes would have the right to use CHAMPION only on "high quality, high performance athletic shoes."

D. **The Tenth Amendment to the License Agreement**

21. In 2017, Hanes requested that the License Agreement be amended so that Hanes could sublicense its right to the CHAMPION mark in footwear to a third party, BBC International LLC. Keds agreed, and the License Agreement was amended effective November 1, 2017 (the "Tenth Amendment"). A copy of the Tenth Amendment is attached hereto as **Exhibit B**.

22. In conjunction with discussions related to Hanes' request for its new sublicense, Hanes expressed concern that Keds was using CHAMPION for footwear in foreign territories where, Hanes

claimed, Keds had inferior rights to Hanes, which Keds disputed. Notwithstanding these purported concerns, and in consideration for the execution of the Tenth Amendment, Hanes agreed to release Keds from any claims concerning Keds' historic use of the CHAMPION mark in foreign territories. Hanes also promised not to contest the continuance of Keds' historic use of the mark until the earlier of (a) 60 months or (b) a renegotiation of the License Agreement. Section 7 of the Tenth Amendment states as follows:

> Keds asserts that through many years of use without objection, it has acquired equitable rights to continue its historic uses of the CHAMPION word mark outside of the Territory. [Hanes] disagrees with such assertion, and does not agree that Keds has any rights in the CHAMPION word mark outside of the Territory beyond any rights Keds may have in those jurisdictions where Keds has registered trademark rights to "KEDS CHAMPION". In consideration of the execution of this Tenth Amendment by Keds, [Hanes] hereby waives and releases Keds from all causes of action it may have stemming from or arising out of Keds's historic uses of the CHAMPION trademark outside of the Territory (and Keds's continued uses during the time period described below), such uses consisting primarily of use on shoeboxes, show tongue labels, and other venues (e.g., websites) as a product or collection name, and ***[Hanes] agrees that [Hanes] will not contest the continuance of such historic uses for sixty (60) months after the Tenth Amendment Effective Date, or until renegotiation of the License Agreement, whichever occurs first*** (emphasis added).

23. Nothing in the Tenth Amendment requires either party to renegotiate the License Agreement.

E. **Hanes Files Meritless Lawsuit**

24. Notwithstanding the plain and unambiguous language of the Tenth Amendment, Hanes commenced federal court litigation to do exactly what it promised not to do: contest Keds' historic uses of CHAMPION. A copy of Hanes' federal court complaint is attached hereto as **Exhibit C** (asserting in paragraph 19 that "[t]hrough this Complaint, and as further alleged herein," Hanes is challenging "Keds' 'historic uses'" of CHAMPION mark).

25. As Hanes knew or was reckless in not knowing, Hanes' lawsuit was meritless. Hanes'

7

breach of contract claim was premised on the false assertion that the Tenth Amendment required Keds to renegotiate the License Agreement. But this claim is contradicted by the plain terms of the License Agreement, which do not include any obligation whatsoever for Keds to renegotiate. Hanes' trademark-based claims were equally deficient; not only were the trademark claims expressly barred by Section 7 of the License Agreement, but the federal court lacked jurisdiction over them because, among other things, they related to trademark use in foreign jurisdictions. Moreover, Hanes' trademark-based claims were so unfounded that Hanes could not muster a single example of consumer confusion despite the parties' decades-long, mutual use of CHAMPION in connection with footwear.

26. Hanes' legal theories were so transparently baseless—and its claims so obviously barred by the Tenth Amendment—that it was immediately apparent to Keds that Hanes had filed its lawsuit with one purpose: as a tactic to force the renegotiation of a contract Hanes disliked.

**F.    Hanes Launches Calculated Media Campaign**

27. Hanes compounded the filing of its meritless lawsuit by intentionally withholding from Keds the fact that the lawsuit had been filed and, instead, allowing legal news services and industry media sources to report on the lawsuit before serving the complaint on Keds. This tactic was calculated to put maximum pressure on Keds to renegotiate the License Agreement.

28. Hanes filed its lawsuit on July 17, 2020. Even though at that time Hanes and Keds had been business partners for 33 years, Hanes did not extend to Keds the courtesy of a telephone call or an e-mail advising Keds that it was filing federal court litigation against its longtime business partner. Instead, Hanes filed the complaint and then waited silently, allowing its complaint to get picked up and published by legal news services. Law360, for example, published a news article late in the day on July 17, 2020 reporting on the lawsuit and quoting from Hanes' baseless and misleading complaint.

29. Significantly, on July 19, 2020—still days before Hanes would finally give Keds any notice of the lawsuit—*Footwear News* published an article reporting on the lawsuit and repeating

numerous false and disparaging allegations from the complaint.

30. The *Footwear News* article describes Hanes' claim that Keds "agreed to an amendment allowing for a renegotiation of the deal in 2018." It also reports on Hanes' allegations that "Keds has not lived up to the terms of the amendment," that "Keds has failed to engage in the promised renegotiation of the license agreement," and that "Keds has flatly refused to renegotiate." Yet as Hanes knew full well, the parties never agreed to a "renegotiation" of the License Agreement in 2018 or at any other time. Rather, Hanes agreed that it would not sue Keds until the earlier of a renegotiation or 60 months. These allegations, reported in the most widely-read publication in the footwear industry, unfairly and without basis paint Keds as a bad business partner that fails to honor the contracts it signs.

31. In short order, numerous other media outlets followed suit, publishing news articles describing the lawsuit, and repeating Hanes' unfounded allegations. Articles reporting on Hanes' lawsuit were featured on Yahoo.com on July 19, 2020 and on Bloomberg Law, among other websites, on July 20, 2020.

32. Hanes' concerted effort to leverage a better deal by facilitating press coverage that Hanes knew would be harmful to Keds is likely to have significant and long-term effects on Keds. Keds negotiates dozens of agreements each year with its business partners. Keds' ability to attract and retain business partners, and to negotiate favorable terms with these partners, is directly related Keds' perception in the footwear industry—and is inextricably linked to Keds' reputation as a partner that can be trusted at the negotiating table. Hanes' frivolous allegations accusing Keds of reneging on Keds' contractual obligations have tarnished the goodwill and esteem Keds has built over decades of good faith business dealings and threaten its ability to attract and retain quality business partners.

33. While Hanes' dubious allegations have irreparably harmed Keds' reputation and goodwill, the impact of Hanes' unlawful conduct extends to Keds' corporate parent, Wolverine World

Wide, Inc. ("Wolverine"), and Wolverine's other footwear and apparel brands, including Sperry, Merrell, and Saucony, among many others. It is widely known in the footwear industry that Keds is owned and operated by the same company—Wolverine—that owns and operates a dozen footwear and apparel brands. As a result, Hanes' false and disparaging assertions about Keds damaged the reputation and goodwill of Wolverine and its brand holdings by virtue of their close association with Keds.

34. Keds did not learn about the complaint until its President discovered the article when she was reading *Footwear News* on the afternoon of July 20, 2020. Keds was shocked. Keds could not believe that its business partner of over three decades would file a lawsuit without any prior notice to Keds.

35. Hanes did not finally serve Keds with a copy of the complaint until July 22, 2020, five days after filing the complaint and several days after media outlets had already reported Hanes' allegations.

36. Hanes' deliberate decision not to advise Keds about the lawsuit after it was filed—and, instead, to wait for the complaint to be picked up and reported on by the news media, including the footwear industry's leading publication—was intended to create leverage against Keds by enhancing Hanes' perceived bargaining power.

**G. Keds Attempts to Engage Hanes**

37. After reviewing the complaint, it was immediately clear to Keds that Hanes' allegations failed to state a claim and that the Court lacked jurisdiction over the case. In a good faith effort to resolve the dispute before incurring defense costs, Keds sent a letter to Hanes in early August 2020 describing the complaint's obvious deficiencies and requesting that Hanes withdraw its lawsuit. Keds also expressed its concern that the lack of any basis for Hanes' claim suggested that the lawsuit was "an attempt to gain a perceived strategic advantage so that [Hanes could] renegotiate a deal that

it believes is no longer in its interest."

38. Hanes refused to withdraw its complaint, ignoring Keds' common-sense contract analysis, and offering only to "discuss[] the subject matter of this dispute." Hanes' response to Keds' letter further clarified that Hanes' sole objective was to use the lawsuit and associated press coverage to browbeat its business partner into renegotiating the License Agreement.

**H.     Hanes Commences Lawsuit in Conjunction with Multi-Billion Dollar Growth Plan**

39. As Keds has since learned, at or around the time Hanes filed its lawsuit, Hanes embarked upon a multi-billion-dollar growth strategy called the "Full Potential Plan." Since the filing of the lawsuit, Hanes has continued to pursue and promote to the public and its investors the "Full Potential Plan."

40. The "Full Potential Plan" includes four "pillars" intended to aggressively increase the company's profits. The first "pillar" is "rapid growth of the Champion brand." A key component of this "pillar" is the expansion of CHAMPION-branded footwear. Recently, during a 2021 second quarter earnings call, Hanes' CEO explained that through the first half of 2021, Hanes had "more than doubled [its] points of distribution and the number of pairs [of shoes] sold as compared to 2019. We believe the initial momentum in our footwear business underscores the consumers' affinity for the Champion brand, and their brand interest across product categories."

**I.     Court Rejects Hanes' Legal Theories and Dismisses Lawsuit**

41. On September 14, 2020, Keds filed a motion to dismiss Hanes' lawsuit on the grounds that the complaint failed to state a legal claim and that the Court lacked jurisdiction to adjudicate the case. Hanes opposed the motion.

42. On April 28, 2021, counsel for Keds and Hanes presented oral argument to the Hon. Indira Talwani in connection with Keds' motion to dismiss. During the hearing, Judge Talwani made clear that she was not persuaded by Hanes' contention that Keds had breached the License Agreement,

but nevertheless took the matter under advisement. A copy of the transcript from the April 28, 2021 hearing is attached hereto as **Exhibit D**.

43. On May 21, 2021, Judge Talwani issued a detailed, 19-page memorandum and order granting Keds' motion and dismissing Hanes' lawsuit in its entirety. A copy of the May 21, 2021 Memorandum and Order is attached hereto as **Exhibit E**. The Court agreed with Keds that the License Agreement was unambiguous and that "[n]othing in the contractual language implies an obligation on either party to engage in renegotiation." Therefore, the Court ruled, Hanes had failed to state a claim for breach of contract. The Court also dismissed Hanes' claims for breach of the covenant of good faith and fair dealing, concluding that Hanes had not presented any facts suggesting bad faith. The Court explained as follows:

> While Hanes may be disappointed that Keds is unwilling to renegotiate the License Agreement, Keds is not required to do so, and Hanes cannot ask the court to rewrite a contract through the implied covenant of good faith and fair dealing.

The Court also dismissed Hanes' Chapter 93A claim on the grounds that it was derivative of Hanes' unsuccessful contract claims. Finally, the Court dismissed Hanes' trademark-based claims because it lacked subject matter jurisdiction over those claims. The Court concluded that Hanes had not sufficiently alleged facts warranting the extraterritorial application of the Lanham Act to Hanes' trademark-based claims.

**J.  Hanes Pursues Baseless Appeal**

44. After the Court dismissed its complaint, Hanes did not contact Keds. Instead, on June 14, 2021, Hanes filed a notice of appeal.

45. On July 27, 2021, Hanes and Keds participated in a mandatory settlement conference. Keds entered the conference with the faint hope that Hanes had finally come to its senses after the Court's ruling on the motion to dismiss. Unfortunately, the conference confirmed what Keds has suspected all along—that Hanes is using the federal courts as a tool to negotiate an agreement that it

otherwise did not (and could not) get. This was the final straw for Keds.

**K.     Keds Terminates License Agreement**

46.     By August 2021, Hanes' concerted, ongoing campaign to pressure and leverage Keds to renegotiate the License Agreement had caused irreparable damage to the parties' business relationship. Hanes' public accusations that Keds had engaged in improper conduct based on Hanes' objectively unreasonable interpretation of the License Agreement was not only a material breach of contract, but had also resulted in a fundamental breach of trust, irreversibly destroying the business relationship. Hanes' conduct left Keds with no choice but to discontinue the partnership.

47.     As of mid-August 2021, Hanes had, among other things: (a) defaulted in observing and performing its obligations under Section 7 of the Tenth Amendment by filing a lawsuit against Keds contesting Keds' historic use of CHAMPION; (b) failed to provide its business partner of more than three decades any prior notice before filing its lawsuit, and instead waited for its complaint to get picked up and published by the media, including the key footwear industry publication; (c) asserted a contract interpretation that was dead on arrival, as Keds pointed out to Hanes in no uncertain terms promptly upon review of the complaint; (d) caused Keds to spend hundreds of thousands of dollars defending itself in court against Hanes' frivolous claims; (e) intentionally taken steps to harm Keds' goodwill and reputation, including in the footwear industry; (f) failed and refused to communicate with Keds after Judge Talwani summarily rejected Hanes' breach of contract claim during oral argument; (g) failed and refused to communicate with Keds after the Court issued its May 21, 2021 order dismissing Hanes' complaint in its entirety, and instead doubled down on its bogus legal theory by filing a notice of appeal; and (h) attempted to use the settlement conference to coerce a renegotiation of the License Agreement.

48.     As a result of Hanes' ongoing bad faith conduct, Keds simply could not partner with Hanes any longer. Accordingly, on September 2, 2021, Keds issued a notice of termination of the

License Agreement and, through this lawsuit, seeks to recover the costs and damages Keds suffered as a result of Hanes' knowing breach of the License Agreement.

49. Even though the end of the License Agreement will result in substantial lost royalties owed to Keds, these losses—while significant—are relatively short-term losses. Remaining in a business partnership with Keds, a "partner" Keds cannot trust, would undoubtedly result in even greater losses in the future. Among other things, Keds' numerous other business partners are watching. Giving Hanes a free pass in response to such a material, bad faith breach would send a clear message to Keds' business partners; namely, that breaching a contract with Keds has no consequences. Such non-action would unquestionably invite the risk of future non-compliance from these and other partners.

## CAUSES OF ACTION

### COUNT I
### (Breach of Contract)

50. Keds re-alleges and incorporates by reference all the allegations contained in Paragraphs 1 through 49 above as if fully set forth herein.

51. Keds and Hanes entered into an enforceable agreement under the terms of which Hanes agreed not to sue Keds with respect to Keds' historic uses of the CHAMPION trademark outside the United States and Canada until the earlier of 60 months or the renegotiation of the License Agreement. In exchange, Keds agreed that Hanes could sublicense its right to the CHAMPION mark to a third party.

52. Hanes materially breached the agreement by suing Keds for its historic uses of the CHAMPION trademark outside the United States and Canada absent any renegotiation of the License Agreement and prior to the expiration of the 60-month moratorium.

53. Keds has performed all of its obligations under the Agreement.

54. As a direct result of Hanes' breaches of the License Agreement, Keds has and will

continue to suffer monetary damages for which Hanes is liable, together with interest, costs, and attorneys' fees.

## COUNT II
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

55. Keds re-alleges and incorporates by reference all the allegations contained in Paragraphs 1 through 54 above as if fully set forth herein.

56. The License Agreement is governed by and construed under the laws of Massachusetts, which imputes a covenant of good faith and fair dealing in every contract.

57. Hanes' conduct as set forth above constitutes one or more breaches of the covenant of good faith and fair dealing.

58. As a direct result of Hanes' breaches of the covenant of good faith and fair dealing, Keds has and will continue to suffer monetary damages for which Hanes is liable, together with interest, costs, and attorneys' fees.

## COUNT III
### (Violations of Mass. Gen. Laws ch. 93A, §§ 2, 11)

59. Keds re-alleges and incorporates by reference all the allegations contained in Paragraphs 1 through 58 above as if fully set forth herein.

60. Hanes is engaged in trade or commerce in the Commonwealth of Massachusetts.

61. The acts and omissions of Hanes, as alleged above, constitute unfair and deceptive acts or practices in violation of Chapter 93A.

62. The conduct constituting Hanes' unfair and deceptive acts and practices occurred primarily or substantially within Massachusetts. Among other things, Hanes filed its lawsuit against Keds in Massachusetts.

63. Hanes' violations of Chapter 93A were knowing and willful.

64. As a direct and proximate result of Hanes' unfair and deceptive acts and practices, Keds has suffered the loss of money and property, including incurring significant and unreimbursed costs and expenses.

## RELIEF SOUGHT

65. WHEREFORE, Keds requests the following relief:

   a. As to Count I, enter judgment in favor of Keds and award Keds monetary damages in an amount to be determined against Hanes, together with interest, costs, attorneys' fees, and other amounts under applicable law;

   b. As to Count II, enter judgment in favor of Keds and award Keds monetary damages in an amount to be determined against Hanes, together with interest, costs, attorneys' fees, and other amounts under applicable law;

   c. As to Count III, enter judgment in favor of Keds and award Keds monetary damages, including treble damages, in an amount to be determined against Hanes, together with interest, costs, attorneys' fees, and other amounts under applicable law; and

   d. Grant such other relief as the Court deems just and proper.

## JURY DEMAND

Keds hereby demands a trial by jury on all counts so triable.

Respectfully submitted,

KEDS, LLC and SR HOLDINGS, LLC,

By their attorneys,

/s/ *Zachary C. Kleinsasser*
Zachary C. Kleinsasser (BBO# 664291)
kleinsasserz@gtlaw.com
GREENBERG TRAURIG, LLP
One International Place
Boston, MA 02110
Tel: (617) 310-6293
Email: kleinsasserz@gtlaw.com

        Scott J. Bornstein, Esq.
        (*pro hac vice* application forthcoming)
        GREENBERG TRAURIG, LLP
        MetLife Building
        200 Park Avenue
        New York, NY 10166
        Tel: (212) 801-9200
        Email: bornsteins@gtlaw.com

        Nina D. Boyajian, Esq.
        (*pro hac vice* application forthcoming)
        GREENBERG TRAURIG, LLP
        1840 Century Park East, Suite 1900
        Los Angeles, California 90067
        Tel: (310) 586-7700
        Email: boyajiann@gtlaw.com

Dated: September 2, 2021